830 F.Supp. 510 (1993)
Michael P. TABOR, Plaintiff,
v.
The PRUDENTIAL INSURANCE COMPANY OF AMERICA, Defendant.
No. 4:92CV998 GFG (CDP).
United States District Court, E.D. Missouri, E.D.
July 22, 1993.
*511 Joel B. Eisenstein, Daniel L. Goldberg, Eisenstein and Smith, St. Charles, MO, for plaintiff.
Catherine Hope Johnson, Richard J. Pautler, Partner, Peper and Martin, St. Louis, MO, for defendant.

MEMORANDUM OPINION
PERRY, United States Magistrate Judge.
This case was referred to the undersigned for trial and all other purposes with consent of the parties pursuant to 28 U.S.C. § 636(c), and was submitted for decision without trial but on stipulated evidence, exhibits, deposition testimony, and briefs.

Findings of Fact
1. On or about June 1, 1990, defendant The Prudential Insurance Company of America ("Prudential") issued a group health insurance policy ("Policy") to Dillards Department Stores. Plaintiff Michael P. Tabor, a full-time student residing in Columbia, Missouri, was, at the times relevant to this suit, covered as a dependent under the terms of the Policy, as a result of his mother's employment at Dillards.
2. On December 16, 1991, Michael Tabor experienced pain in his testicles, and so drove himself to visit Dr. Mack, the Walk-In Clinic doctor at the University of Missouri at Columbia. Dr. Mack examined plaintiff that day, observed a lump in his left testicle and referred plaintiff to Dr. Winston Harrison, a urologist. Plaintiff visited Dr. Harrison the next day, December 17, 1991, at approximately 10:00 a.m.
3. Dr. Harrison detected the lump in plaintiffs left testicle and ordered plaintiff to immediately undergo an ultrasound and other diagnostic tests. Dr. Harrison diagnosed Tabor as having testicular cancer and recommended that Tabor undergo surgery to remove the left testicle. Dr. Harrison told plaintiff that "it was best to do [the surgery] as soon as possible," but Dr. Harrison never told plaintiff that his condition was an "emergency situation." Dr. Harrison then scheduled the surgery for the next morning, December 18, 1991.
4. On December 18, 1991, beginning at approximately 8:40 a.m., Tabor was prepared for surgery, and at approximately 9:45 a.m., Dr. Harrison performed the surgery at Columbia Regional Hospital, removing Tabor's left testicle and installing a prosthesis in its place. The result of the pathology tests performed after the surgery revealed that the tumor was an "embryonal carcinoma," a form of testicular cancer. Dr. Harrison considered a plaintiff's surgery a "priority" "because of the possibility that it [the cancer] could spread early." Embryonal carcinoma is a form of germ cell cancer which can spread via the blood throughout a patient's body.
5. Under the terms of the Policy, coverage is available for eligible services and supplies only if provided by, or authorized by, the participant's "Primary Care Physician." The policy defines "Primary Care Physician" as:
A Physician who is a Participating Health Care Provider and who is chosen by a Covered Person to have the responsibility for: (1) providing initial and primary medical care to the Chosen Person; (2) maintaining the continuity of the Covered Person's *512 medical care; and (3) initiating referrals to Consulting Physicians, Specialty Care Providers and other Participating Health Care Providers....
"Participating Health Care Provider" is defined by the Policy as:
A Physician, Hospital or other provider of medical services or supplies which is licensed or certified in the state in which it is located and which has agreed with PruCare, directly or indirectly, to arrange or provide for furnishing services and supplies for medical care and treatment to Covered Persons.
6. Hospitals which were "Participating Health Care Providers" under the Policy included Barnes Hospital, Missouri Baptist Hospital, St. John's Mercy Hospital, St. Anthony's Hospital, Christian Hospital Northeast, Christian Hospital Northwest, and others in the St. Louis area.
7. None of the treatment Tabor received on December 17, 1991 and December 18, 1991 was provided by, or authorized by, Tabor's Primary Care Physician. Columbia Regional Hospital, where the surgery was performed, is not a "Participating Health Care Provider."
8. Plaintiff did not notify defendant, prior to his surgery, nor did plaintiff or Dr. Harrison attempt to arrange for the surgery to be performed at a Participating Health Care Provider. The travel time from Columbia, Missouri, to St. Louis, Missouri, is approximately two hours, by car.
9. An exception to the Policy's requirements that treatment be provided by, or authorized by, a Primary Care Physician, is when the Participant is being treated in connection with a "Medical Emergency," which the policy defines as:
A person's Sickness or Injury of such a nature that failure to get immediate medical care could put the person's life in danger or cause serious harm to the person's bodily functions, as determined by the Medical Director. Some examples of a Medical Emergency are: apparent heart attack including, but not limited to, severe, crushing chest pain radiating to the arms and jaw; cerebral vascular accidents; severe shortness of breath or difficulty in breathing; severe bleeding; sudden loss of consciousness; convulsions; severe or multiple injuries, including obvious fractures; severe allergic reactions; cyanosis; apparent poisoning. Some examples of conditions that are not usually Medical Emergencies: colds; influences [sic]; ordinary sprains; children's ear infections; nausea; and headaches. In connection with the pregnancy of a Covered Person, a term delivery, whether vaginally or by Caesarean section, inside or outside the Service Area is not a Medical Emergency.
(Emphasis added.)
10. On or about December 27, 1991, Richard Fallon, M.D., Prudential's Medical Director made the initial determination that Tabor's treatment was not covered under the terms of the Policy. Dr. Fallon notified Tabor of his decision in writing on that date.[1]
11. Tabor incurred medical expenses from this treatment and surgery in the amount of $8,696.85. He initially submitted claims for $7,641.35 of this amount, and later submitted a claim for $534.50. He has never submitted a claim for the remaining $421.00 incurred. He has paid none of these charges. All charges incurred by Tabor are fair and reasonable charges for the services rendered.
12. On or about January 9, 1992, Prudential denied Tabor's claims for benefits at the direction of Dr. Fallon, the Medical Director, on the grounds that the treatment received by Tabor was performed by non-participating medical providers and did not constitute a "medical emergency" under the terms of the Policy, Dr. Fallon determined that although the treatment Tabor received may have been medically necessary, it was not treatment rendered in connection with a medical emergency *513 as defined by the Policy. Tabor appealed this determination to Sharon Lewis, M.D., Prudential's Regional Director of Medical Services in Houston, Texas, who upheld Dr. Fallon's denial of benefits, finding that Tabor's condition was not a "medical emergency" under the terms of the Policy and that Tabor could have been treated in St. Louis by Participating Health Care providers. Dr. Lewis' determination was then referred to Prudential's Southwest Group Operations Appeals Committee for review, which affirmed the decision to deny coverage.
13. Dr. Harrison has testified that plaintiff's condition was a medical emergency on December 17, 1991. Dr. Harrison stated that "even a day['s] delay might have made a difference" and Dr. Harrison did not want to delay surgery even a day. Dr. Harrison acknowledged that when he examined plaintiff on December 17, 1991, he wrote that "the patient is alert, ambulatory, and cooperative, in no acute distress," but Dr. Harrison testified that a person need not be in acute distress in order for him to consider that person's condition an emergency. Dr. Harrison reiterated this assessment later in response to the question, "... did you believe on December 17, 1991 that Mr. Tabor's life was in danger without immediate care within 24 to 48 hours?" Dr. Harrison responded, "You bet." Dr. Harrison was then asked why, if plaintiff's life was in danger, he did not operate immediately. Dr. Harrison responded that he would have liked to, but it was best for him, the hospital, and plaintiff to wait until the first thing the next morning.
15. Richard H. Fallon, M.D. (PruCare Medical Director) made the decision that plaintiff's claim should not be paid "because the services were provided by [an] out-of-network, non-participating physician and [a] non-participating hospital." Dr. Fallon agreed that the services provided to plaintiff were "medically necessary," but because they were not emergency services they were not covered under plaintiffs policy with defendant. Dr. Fallon determined that plaintiff's condition was not an emergency because his condition was not "life threatening [or] requir[ing] immediate treatment to prevent endangerment of life." The following dialogue took place at Dr. Fallon's deposition:
Q Would you agree with me that failure to treat testicular cancer could be a life threatening condition?
A Not immediately, no.
Q When someone comes in and has  is detected with testicular cancer there's no way of knowing when that cancer is going to spread?
A That's right.
Q There is no way of knowing whether, in fact, the cancer has already spread, is that correct?
A That's correct.
Q As a physician how long would you wait to treat someone who's suspected of having testicular cancer?
A I don't treat testicular cancer.
Q So, I guess I don't understand then why, if you don't treat it, why you made the decision that it wasn't an emergency?
A Based on the knowledge that I do have of oncology, having dealt with it, I know of no evidence that treatment has to be within a matter of hours or days.
16. Dr. Fallon was then asked whether he could differentiate the various types of testicular cancer and their relative severity. Dr. Fallon described seminoma, but he did not mention plaintiff's cancer, embryonal carcinoma. Dr. Harrison has testified that while seminoma is the most common form of testicular cancer, plaintiff's cancer was "more aggressive" and "much more malignant" than a seminoma. Dr. Fallon reiterated that plaintiff did not require immediate surgery because he did not "think treatment in 12 to 24 hours had been documented to influence long-term survival." Dr. Fallon later reiterated, "there was not an immediate threat to his life that would not allow time to make the necessary arrangements for appropriate care."
17. Dr. James G. Bucey reviewed the medical files in this case. He determined that Dr. Harrison properly performed an ultrasound on plaintiff on December 17, 1991 and properly concluded that surgery was necessary. Dr. Bucey further observed that Dr. Harrison properly explained to plaintiff *514 the necessity of doing the surgery as soon as reasonable, or in "several days max." Where Dr. Bucey and Dr. Harrison parted paths was on the question of whether it was a medical necessity for plaintiff to have surgery within 24 hours of Dr. Harrison's diagnosis. Dr. Bucey concluded that while prompt surgery was necessary, plaintiff could have traveled to St. Louis for such surgery, and the surgery could have waited a couple of days.
18. Dr. Bucey thus concluded that plaintiff's condition was not a medical emergency. Dr. Bucey stated, "if Michael Tabor hadn't had treatment for a day or two ... it wouldn't have affected him as far as [he was] concerned." Dr. Bucey acknowledged that in a case such as plaintiff's where the cancer had spread, or might spread, delay put plaintiff at risk, but Dr. Bucey concluded that this additional risk was not a life-threatening risk because "we have such effective ways of treating cancer today ... that [testicular cancer] doesn't represent the medical emergency that it used to."
19. Dr. Bucey further explained that as recently as two weeks before his deposition he was confronted with a patient suffering from a testicular cancer confirmed by ultrasound. Dr. Bucey performed the surgery two to three days after the patient first came to him on referral. Dr. Bucey did not feel that this delay put his patient "in any significant danger." While such a situation is "urgent" Dr. Bucey does not consider it an "emergency."
20. Dr. Bucey also testified that in his opinion arrangements could have been made to treat Tabor at Barnes Hospital or another participating hospital as soon as he was actually treated in Columbia.

Conclusions of Law
This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331 in that this case arises out of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 et seq. This Court also has personal jurisdiction over defendant, The Prudential Insurance Company of America. Venue is proper in this district under 28 U.S.C. § 1391. The undersigned is empowered to decide the case pursuant to 28 U.S.C. § 636(c).
The first issue to be determined in this case is the standard of review to be applied by the Court. Plaintiff brings this cause of action under the auspices of 29 U.S.C. § 1132(a)(1)(B) "to recover benefits due to him under the terms of his plan ..." Plaintiff alleges that defendant has misinterpreted the definition of "medical emergency" under the plan, while defendant contests that allegation. This case thus involves the "interpretation" of the plan in question. In Firestone Tire and Rubber Co. v. Bruch, 489 U.S. 101, 115, 109 S.Ct. 948, 956, 103 L.Ed.2d 80 (1989), the Supreme Court held that the appropriate standard of review in such cases is de novo, "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." Id. See also Johnson v. Enron, 906 F.2d 1234, 1237-38 (8th Cir.1990). In the event that the plan vests discretion in the administrator or a fiduciary, this Court may not overturn a contested decision unless the decision was arbitrary and capricious or an abuse of discretion. See Johnson, 906 F.2d at 1238.
The plan in this case clearly and specifically vested discretion in the Medical Director (Fallon) to determine what situations could be classified as medical emergencies. This Court's standard of review is therefore an "abuse of discretion" standard.
The parties' next dispute concerns who bears the burden of proof. Each party argues that a recent Eighth Circuit decision, Farley v. Benefit Trust Life Ins. Co., 979 F.2d 653 (8th Cir.1992), supports its position that its opponent has the burden of proof in this case. In Farley, the Court was confronted with the widower of a cancer victim who was seeking benefits for the unsuccessful cancer treatment of his wife. Mrs. Farley had undergone "investigational/experimental" treatment despite an admonition from Benefit Trust that it would not pay for such treatment because the treatment was not "medically necessary" as that term was defined by the plan at issue. The Eighth Circuit held that the burden of proof would *515 be on the plaintiff if the case turned on whether plaintiff was entitled to a "benefit," while the burden would be on the defendant if the case turned on whether the plaintiff's treatment was "excluded" from coverage. Farley, 979 F.2d at 658. The Court specifically reasoned that the issue should be governed by an analysis of whether the language in question was found in the benefits or exclusions section of the plan.
In the case at hand, medical emergencies are described in the benefits section of the plan as follows:
Medical Emergencies: An Eligible Service or Supply that is furnished to a person (a) in connection with a Medical Emergency occurring inside or outside the Service Area, and (b) within the first 48 hours following the onset of the Medical Emergency does not have to be authorized by a Primary Care Physician. However, no service or supply in connection with the Medical Emergency will be eligible after those first 48 hours unless: (a) the person notifies PruCare or its designee of the emergency incident within those first 48 hours; and (b) the service or supply is authorized by a Primary Care Physician. If, because of the patient's condition, it is not reasonably possible to give such notice within this time limit, PruCare or its designee must be notified as soon as reasonably possible. In connection with a Covered Person's Pregnancy, a term delivery, whether vaginally or by Caesarean Section, inside or outside the Service Area, is not a Medical Emergency.
Also within the "benefits" section of the plan is the requirement that "all eligible services and supplies must be furnished to a person (a) by a Primary Care Physician; or (b) by another Participating Health Care Provider and authorized by a Primary Care Physician; or (c) by a Non-Participating Health Care Provider and authorized by a Primary Care Physician." (Id.) And, as discussed previously, medical emergencies are defined in the definition section of the plan, and the definition section is incorporated into the "benefits" section by reference.
Exclusion No. 20 of the plan provides that the following "services, supplies and benefits" are excluded:
(20) Services or supplies, or any charges for services or supplies, that are furnished: (a) by a Participating Health Care Provider or a Non-Participating Health Care Provider; (b) in connection with a Medical Emergency occurring inside or outside the Service Area; and (c) after the first 48 hours following the onset of the Medical Emergency. But this (20) will not apply if PruCare or its designee is given notice of the emergency incident within those first 48 hours and the service or supply is authorized by a Primary Care Physician. If, because of the patient's condition, it is not reasonably possible to give such notice within this time limit, PruCare or its designee must be notified as soon as reasonably possible.
Plaintiff's plan simply does not provide benefits for non-emergency medical services provided by a non-participating health care provider. Emergency medical services are covered by the plan, regardless of who provides the services, within forty-eight hours of the emergency, but the plan excludes coverage for any such service rendered more than 48 hours after the onset of the emergency unless the service is authorized by a primary care physician. Thus, if the only issue were coverage of treatment received 48 hours after a "medical emergency," defendant would bear the burden. Since the issue is instead whether the treatment was, in fact, a "medical emergency," plaintiff bears the burden of showing that defendant's denial of benefits was arbitrary and capricious. That is, because plaintiff argues that he obtained an emergency medical service within 48 hours of the onset of the emergency, plaintiff is seeking a benefit described within the benefits section of his plan. The burden of proof is therefore on plaintiff to establish that he is entitled to the benefits in question.
Plaintiff has not carried his burden of establishing that Dr. Fallon's decision that plaintiff's condition was not a medical emergency was arbitrary and capricious or an abuse of discretion. Dr. Fallon was not an *516 oncologist or a urologist, but this fact does not render his decision "not competent" as plaintiff argues. Rather, the evidence supports the conclusion that Dr. Fallon's decision was medically competent. Dr. Bucey, an eminent Board Certified Urologist, concurred with Dr. Fallon's decision that plaintiff's condition was not a medical emergency. Plaintiff's treating physician disagreed, but even he did not perform the surgery immediately upon his diagnosis, but instead scheduled it for the next day, when it was more convenient for all concerned.
Plaintiff's strongest argument is that, had plaintiff for some reason not been permitted to go forward with the surgery on December 18, 1991, the delay would have greatly increased the risk of plaintiff's cancer spreading, and this risk was unreasonable in light of the potential that once it spread it could have been uncurable. The evidence presented, however, shows that plaintiff could have arranged for the surgery in St. Louis on December 18, at a participating health care provider, and had ample time to return to St. Louis even if the surgery had been scheduled for the exact same time, but in St. Louis rather than Columbia. Indeed, he could conceivably have had surgery sooner in St. Louis. The issue presented in this case is not whether plaintiff reasonably believed his surgery was a medical emergency, because the plan did not vest the decision in his hands; the issue is whether Dr. Fallon was arbitrary and capricious in determining that it was not an emergency, and the evidence does not demonstrate that he was. Therefore, defendant must prevail on plaintiff's claim.
Accordingly, judgment will be entered in favor of defendant.

JUDGMENT
In accordance with the Memorandum Opinion entered this date,
IT IS HEREBY ORDERED, ADJUDGED AND DECREED that defendant shall have judgment against plaintiff and that plaintiff's claim against defendant is DISMISSED with prejudice.
Neither party shall recover the costs of this action from the other.
NOTES
[1] The parties' stipulation says: "10. On or about December 20, 1992, Dr. Harrison's office contacted The Prudential and inquired about the coverage for treatment Tabor had received on December 17, 1992 and December 18, 1992." The undersigned assumes that all the dates in this paragraph were intended to refer to 1991, and that Dr. Harrison's after-the-fact contact prompted defendant's determination.